UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20724-CR-MIDDLEBROOKS/MCALILEY

UNITED STATES OF AMERICA,

    Plaintiff,
v.

JAMID JONES,

    Defendant.
_____/

**REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant, Jamid Jones, filed a Motion to Suppress Evidence. (ECF No. 15). The government filed a memorandum in response (ECF No. 21) and the Honorable Donald M. Middlebrooks referred the Motion to me. (ECF No. 17). The Court held an evidentiary hearing on the Motion on December 29, 2020, and January 4, 2021.[1] The hearing was held on the Zoom video conferencing platform with the express consent of Defendant, his counsel Jonathan Schwartz, Esq., and government counsel Christina Hernandez, AUSA. (ECF Nos. 32; 38 at 5-6; 42 at 7-8).

I have carefully considered the parties' legal memoranda, the applicable law, the record in this case, and the testimony and argument presented at the evidentiary hearing. For the reasons that follow, I recommend that the Court deny Defendant's Motion.

---

[1] The transcripts of the hearing are docketed at ECF Nos. 38 and 42.

## I. Background

An Indictment charges that on September 11, 2019, Defendant violated Title 18 U.S.C. § 922(g)(1), when he knowingly possessed a firearm and ammunition, knowing that he had previously been convicted of a felony. (ECF No. 3). In his Motion, Defendant argues that City of Miami police officers unlawfully seized from him the firearm and ammunition that is the subject of that Indictment, in violation of his rights under the Fourth Amendment to the Constitution. (ECF No. 15). He asks this Court to exclude from evidence at trial the firearm and ammunition, and "all evidence obtained as a consequence of the unlawful search and seizure…." (*Id.*).

## I. Findings of Fact

The government called two City of Miami Police Department ("Department") Officers to testify at the evidentiary hearing: Ti'Andre Bellinger ("Bellinger") and Juan Cano ("Cano"). Both officers were working on September 11, 2019 and participated in the stop and search of a vehicle in which Defendant was the front seat passenger. Both officers wore body cameras at that time. By agreement of the parties, excerpts of each officer's video and audio recordings were played at the hearing and introduced into evidence.

On September 11, 2019, both officers were members of the Department's problem-solving team, of five officers, assigned to the Model City area of Miami. The team knew that it was common for drivers to run the four-way stop signs at the intersection of Northwest 13th Avenue and 65th Street, creating a hazard to pedestrians. That day, the officers worked a traffic enforcement detail at the intersection. They were in marked police cars and wore police uniforms.

While monitoring the intersection, both officers saw a blue Nissan drive south on Northwest 13th Avenue and proceed through the intersection at 65th Street without stopping. Officer Bellinger directly followed the Nissan with his emergency lights and siren activated, signaling it to stop. Officer Cano was behind his colleague with his vehicle's lights and siren on also. Rather than stop, the Nissan drove another two blocks as Officer Bellinger also sounded his horn. The Nissan then abruptly stopped at Northwest 63rd Street.

While following the Nissan, Officer Bellinger saw, through its rear window, the driver reach over to the passenger. The officer wondered, but could not see, if the driver handed something to the passenger. The driver's and passenger's windows were down, and Officer Bellinger could also see both the driver and passenger look in the side view mirrors back at him; as well as the driver look at him through the rear-view mirror.

Officer Cano was also able to see the driver and passenger of the Nissan through its rear window, moving their heads left and right.

When the Nissan stopped, Officer Bellinger stopped behind it, and Officer Cano parked his vehicle behind Bellinger's. The driver opened his door and started to get out, Officer Bellinger looked, and saw that he did not have anything in his hands and told the driver to stay in the car. Officer Bellinger walked directly to the passenger door because he was concerned that the driver may have handed something to the passenger. As he stood at that door, Bellinger asked the driver for his license, registration and insurance. The driver said that his license was suspended. Officer Bellinger recognized Defendant, who was the passenger, as someone he had arrested a couple years earlier, possibly for a controlled

substance violation. He saw that Defendant had not been wearing his seatbelt and, so that he might issue him a citation for this infraction, the officer asked Defendant for his identification.

When he got out of his patrol car, Officer Cano walked to the driver's door and learned that the driver's license was suspended.[2] Both officers testified that when they heard that the driver was driving without a license, they planned to arrest him for that offense.

The officers saw that the trunk had been cracked opened, which they thought was odd. Officer Bellinger briefly opened the trunk and looked inside to make sure no one was in the trunk, then closed it. In response to the officers' questions, why he opened the trunk, the driver got out of the car and walked to the trunk, stating that something was wrong with it. Officer Bellinger patted the outside of the driver's pockets, to check for weapons, and found none. Officer Cano stood by the driver's door, so that he could see both the driver who was out of the car, and the passenger who was still seated on the front seat, and who was moving about in his seat.

By that point, Officer Bellinger had returned to his patrol car to run the driver's license and check on the vehicle. A woman from the neighborhood – who Defendant later identified as his sister – walked up, made eye contact with Defendant, and stood near his side of the car. Concerned about his ability to maintain safety with the stranger near the car, the Defendant's movements inside the car and the driver standing at the rear of the car

---

[2] A third officer, Officer Ramos, also walked to the driver side and spoke with the driver. At some point, two other officers from the problem-solving team also stopped at the scene.

pending his arrest for driving with a suspended license, Officer Cano told Defendant to step out of the car. Officer Cano wanted these three individuals where he could see them.

Officer Cano gave that instruction as he walked around the rear of the car toward the passenger side, where he saw Defendant open the glove compartment, evidently trying to put something inside. The glove compartment remained open, and empty, as Defendant stepped out of the car. He stood facing the car, with his back to the officer and walked toward the trunk. Defendant was wearing a T-shirt and denim shorts. Officer Cano could only see Defendant from the side, and he noticed a bulge in his right pants pocket. As Defendant stood at the rear of the car, Cano asked Defendant if he had anything in his pockets. Defendant began to remove items from both of his front pockets as the officer continued to ask that question. Defendant put those items, which included a bandana and money, along with his skully hat, on the top of the car trunk.

Officer Cano saw that a small bulge remained in the right pocket and he asked Defendant if he could check his pockets. The officer wanted Defendant's consent before he proceeded to search him. In response, Defendant lifted his arms and pulled up his shirt above his stomach and widened both legs. The officer asked again if he could check Defendant, who continued to lift his arms, indicating that the officer could check him.[3]

Officer Cano then directed Defendant to widen his stance and touched the outside of the right pocket and immediately recognized baggies inside Defendant's pocket. I found credible the officer's testimony that he had both training and on-the-job experience that

---

[3] Officer Cano testified that Defendant responded, "go ahead". I could not hear this on the officer's bodycam recording.

5

enabled him to recognize the feel of small baggies inside of a pocket, from touching the outside of a garment. Officer Cano told Defendant that he felt baggies, and Defendant reached in his pocket and removed a plastic bag that held nine smaller plastic bags, which appeared to contain narcotic drugs. The officer told Defendant that he would place Defendant under arrest and, after patting the outside of Defendant's pockets one more time, Officer Cano handcuffed Defendant and arrested Defendant for suspected possession of narcotics. The officer then searched inside Defendant's pockets, and patted him around his groin, at which point a small firearm fell from Defendant's shorts to the ground. Officer Bellinger walked over and saw the firearm on the ground. Given the presence of the gun, another officer handcuffed the driver. Defendant was placed in Officer Cano's police car.

## II.  Conclusions of Law

The Fourth Amendment requires that the government have a search warrant before it can search and seize, unless it can demonstrate the application of one of the recognized exceptions to the Fourth Amendment warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (*citing Katz v. United States*, 389 U.S. 347, 357 (1967). The government must do so by a preponderance of the evidence.[4] Importantly, "[t]he ultimate touchstone of the

---

[4] Upon a motion to suppress evidence obtained through a warrantless search and seizure, the government bears the burden of proving "that the challenged action falls within one of the recognized exceptions to the warrant requirement ...." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (emphasis and citation omitted). *See also United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (stating that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").

Fourth Amendment is reasonableness." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (citation and quotation marks omitted).

Defendant does not challenge the lawfulness of the officers' stop of the Nissan, for good reason as their warrantless stop plainly was lawful. "A traffic stop, which is a seizure within the meaning of the Fourth Amendment…is constitutional if it is either based on probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (internal citation omitted). The officers had clear probable cause that the driver of the Nissan had violated a traffic law when he failed to stop at the stop sign, and thus they had the authority to order the car to stop.

Defendant does argue that Officer Cano's instruction that Defendant step out of the Nissan was unlawful. This, however, is also without merit. The Supreme Court has long recognized "the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); *see also Maryland v. Wilson*, 519 U.S. 408, 413 (1997). During a lawful traffic stop, officers may take steps that are reasonably necessary to protect their personal safety…including requiring the driver and passengers to exit the vehicle as a matter of course." *Spoerke*, 568 F.3d at 1248.

Here, it was certainly reasonably necessary for Officer Cano to order Defendant to step out of his vehicle. Both officers credibly testified that a collection of circumstances led them to be concerned about their safety, and the safety of the others at the traffic stop.[5]

---

[5] Officer Bellinger credibly testified that traffic stops are inherently dangerous for officers and the public, because officers know little about the occupants and do not know if they have weapons.

7

This traffic stop began with the driver's failure to immediately stop his car when followed by marked patrol cars with activated lights, sirens and horn. The driver's additional two block drive, while evidently handing something to the passenger, and both occupants repeatedly looking back at the police car, reasonably led the officers to worry that the occupants of the car sought to hide something from them, or otherwise do something to prepare for the officers' presence. The fact that the driver immediately stepped out of the car, once he stopped, was out of the ordinary, as was his apparent opening of the trunk. The officers could reasonably wonder if these were intended as distractions. Defendant's apparent movement of things inside the car, and his opening of the glove compartment, added to the officers' reasonable concern that he sought to access or hide something in the car. Officer Cano was clear that under these circumstances, with the driver walking around at the rear of the car, and a then-unknown woman standing near Defendant and making eye contact with him, he felt unsafe with the Defendant seated inside the car. I credit the officer's testimony that he ordered Defendant out of the car so that he could keep all three within his sight and maintain safety. This minimal intrusion was entirely reasonable and lawful. *See Spoerke*, 568 F.3d at 1248.

Defendant next argues that once Defendant was standing outside the car, Officer Cano had no legal authority to pat down his body. Again, this is without merit. The Supreme Court, in *Terry v. Ohio,* set forth the standard of reasonable suspicion for the limited Fourth Amendment intrusion of a stop and frisk. *Terry v. Ohio,* 392 U.S. 1 (1968). "In *Terry*, the Court held that a police officer could stop an individual so long as the officer is aware of facts which allow him, 'reasonably to conclude in light of his experience that

8

criminal activity is afoot ….'" *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987) (quoting *Terry*, 392 U.S. at 30). As noted above, the officer's observation of the traffic infraction justified their stop of the Nissan.

After a lawful stop, the officer may frisk an individual "so long as a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Bonds*, *id.*, (quoting *Terry*, 392 U.S. at 27). This requires "an objectively reasonable fear based upon facts regarding specific individuals. A generalized suspicion or 'hunch' will not justify a frisk." *Id.*

In addition to the officers' observations listed above, when Defendant got out of the car, Officer Cano made two additional observations that added to his concern for safety. First, Defendant kept his back to the officer as he walked to the rear of the car, and second, from his view of the Defendant from the side, the officer could see a bulge in his right pants pocket. When added to the totality of the other circumstances, the Court has before it a collection of specific reasons why the officers feared that the traffic stop could quickly and easily become unsafe. Reasonable suspicion clearly supported Officer Cano's pat down of Defendant.

The scope of the pat down must be limited to what is needed to discover weapons. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citing *Terry*, 392 U.S. at 26). So long as the search stays within these confines, officers may seize contraband they encounter during the search. *Id.* Here, Officer Cano patted down the groin area of Defendant's shorts. Without doubt, a weapon can be hidden in pants and the scope of the search was thus lawful.

At the hearing, it appeared that Defendant sought to isolate the events that caused the officers' concern, to argue that each were not inherently suggestive of danger. This is the wrong approach to an analysis of reasonable suspicion. The Court must consider the totality of the circumstances. "This allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The Court should not view each piece of information the officers relied upon, in isolation, and ask if they are susceptible to an innocent explanation. *Id.* at 274. "*Terry* … precludes this sort of divide-and-conquer analysis." *Id*.

The government argues that Defendant consented to Officer Cano's pat down of his body. For the reasons stated, the officer did not need consent to pat down Defendant, and therefore the Court does not analyze whether the Defendant's actions satisfy the standard for consent.

The Court makes one last observation. Once Officer Cano had probable cause to arrest Defendant for a suspected narcotics violation, he was justified in fully searching Defendant, incident to that lawful arrest. *Chimel v. California*, 395 U.S. 752 (1969); *United States v. Robinson*, 414 U.S. 218 (1973). This is another legal basis for finding that the search was lawful.

### III.   Conclusion and Recommendation

For the foregoing reasons, I conclude that the warrantless search of Defendant on September 11, 2019, did not violate Defendant's rights under the Fourth Amendment. I

therefore respectfully **RECOMMEND** that the Court **DENY** Defendant's Motion to Suppress Evidence. (ECF No. 15).

### IV. Objections

**No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable Donald M. Middlebrooks, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), 28 U.S.C. § 636(b)(1); Fed.R.Crim.P. 59(b), 11th Cir. R. 3-1 (2016).

RESPECTFULLY RECOMMENDED in chambers, at Miami, Florida this 21st day of January 2021.

_____
CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

Cc: Honorable Donald M. Middlebrooks
Counsel of Record